IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2015 JUN -1  AM 10: 34

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____

ELEANOR CROSE, Individually and as
Permanent Guardian of Ronald Crose,
Plaintiff,

-vs-                                                          Case No.  A-14-CA-205-SS

HUMANA INSURANCE COMPANY,
Defendant.

_____

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Plaintiff Eleanor Crose's Motion for Summary Judgment [#21], Defendant Humana Insurance Company's Motion for Summary Judgment [#25] (sealed), the parties' respective Responses [##28-1 (sealed), 29] thereto, the parties' respective Replies [##31-1 (sealed), 32] thereto, Plaintiff's Appendix to Plaintiff's Motion for Summary Judgment [#22], Plaintiff's Supplemental Appendix to Plaintiff's Motion for Summary Judgment [#30], Plaintiff's Unopposed Motion for Leave to File Supplemental Summary Judgment Evidence [#27],[1] and Defendant Humana Insurance Company's Motions for Leave to File Under Seal [##28, 31].[2]  Having reviewed the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

---

[1] Plaintiff's Unopposed Motion for Leave to File Supplemental Summary Judgment Evidence [#27] is hereby GRANTED.

[2] Defendant Humana Insurance Company's Motions for Leave to File Under Seal [##28, 31] are hereby GRANTED.

## Background

Plaintiff Eleanor Crose's husband, 43-year-old Ron Crose, is insured under a health insurance policy issued by Defendant Humana Insurance Company (Humana).  On June 24, 2013, Mr. Crose suffered a stroke which left him mentally and physically impaired.  Plaintiff filed a claim under the policy and Humana denied it, citing to a policy exclusion rendering benefits non-payable when the insured's injury is "due to being intoxicated or under the influence of any narcotic unless administered on the advice of a health care practitioner."  App'x Pl.'s Mot. Summ. J. [#22-3] Ex. C (Policy) at 47.  Plaintiff now sues for breach of contract, unfair insurance practices under Texas Insurance Code § 541.060, and prompt payment violations under Texas Insurance Code § 542.058(a).

At approximately 9:00 p.m. on June 23, 2013, Mr. Crose ingested MDMA, commonly known as "ecstasy," a drug with amphetaminic and hallucinogenic properties. Def.'s Mot. Summ. J. [#25-3] (sealed) Ex. 3 (Crose Dep.) at 38:20–39:4, 40:5–9.  At approximately midnight, Plaintiff, who had been away for the evening attending a concert, met Mr. Crose at a friend's home, where Mr. Crose and friends were swimming. *Id.* at 40:16–20.  Upon Plaintiff's arrival, Mr. Crose told Plaintiff he was nauseated and suffering from diarrhea, and said "earlier in the evening" he had experienced a "terrible" headache which "felt like his head was going to explode." *Id.* [#25-2] (sealed) Ex. 2 (Pl.'s Interrog. Resps.) at 19.  Plaintiff states when she arrived, her husband was sweating, but was otherwise acting normally, and the two swam at their friend's home until approximately 1:00 a.m. and then returned to their home. *Id.*  After arriving home, Plaintiff and Mr. Crose changed clothing and took a walk around their neighborhood; Plaintiff testified her husband "seemed fine" and "seemed himself" during that time. Crose Dep. at 44:15–17.  At approximately 2:00 a.m., Plaintiff

went to sleep, and Mr. Crose told Plaintiff "[h]e wasn't tired and was going to stay up for a bit and play music" which was, according to Plaintiff, not out of the ordinary. *Id.*

Around 9:00 a.m. that same morning (June 24, 2013), Plaintiff found her husband lying in the backyard, non-responsive and in a pool of vomit. Emergency services transported Mr. Crose to the hospital, where he was seen in the E.R. by Dr. Ray Bogitch, who determined Mr. Cross had suffered a stroke caused by bleeding within his brain and recommended emergency neurosurgery. App'x Pl.'s Mot. Summ. J. [#22-2] Ex. B (Bogitch Report) at 3. Concerning Mr. Crose's drug use, Dr. Bogitch's report states: "This is [a] gentleman who unfortunately, with very little past medical history, used MDMA last night and was found down today with a very large intraparenchymal hemorrhage . . . ." *Id.*

Following surgery, Mr. Crose was examined by Dr. John Hinze, D.O., who indicated in his report he "suspect[ed]" Mr. Crose's stroke was "due to uncontrolled hypertension likely from his ecstasy ingestion." Def.'s Mot. Summ. J. [#25-4] (sealed) Ex. 4 (Hinze Report) at 2. Dr. Hinze's report further noted MDMA ingestion "would account for [Mr. Crose's] diaphoresis [sweating], nausea, vomiting, diarrhea, and could produce a hypertensive state, which would exacerbate if not initiate" Mr. Crose's stroke. *Id.* Finally, Dr. Hinze noted two additional signs of MDMA ingestion: "[i]ncreased transaminases," or elevated levels of certain liver enzymes, and "[m]ild hyponatremia," or slightly low sodium concentration in the blood. *Id.*

On August 13, 2013, Mr. Crose received a follow-up examination in the Austin Regional Clinic, where Dr. Mark Nugent noted Mr. Crose's stroke "occurred on June 24 when he was found unresponsive in his yard. He had complained the night before of an intense headache following

ingestion of MDMA.   He was found to have had a large left-sided intraparenchymal hemorrhage . . . ." *Id.* [#25-7] (sealed) Ex. 7 (Nugent Notes) at 1.

Based on these medical records, Humana declined to pay insurance benefits for Mr. Crose given the intoxication and narcotics exclusion cited above.  On March 7, 2014, Plaintiff initiated this action by filing her complaint, and the instant cross-motions for summary judgment followed.

## Analysis

### I.      Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508.  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586.  Mere

conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*

"Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II. Application

Plaintiff argues she is entitled to summary judgment because Humana cannot prove the exclusion, upon which it relied to deny Plaintiff's claim, applies. Plaintiff makes four arguments: (1) MDMA is not a "narcotic" and thus cannot fall within the exclusion; (2) there is no evidence Mr. Crose's stroke was "due to being . . . under the influence of any narcotic"; (3) there is no evidence Mr. Crose was "intoxicated" at the time of his stroke; and (4) there is no evidence "being intoxicated" caused Mr. Crose's stroke. Humana disagrees, claiming summary judgment in its favor

is appropriate, as Mr. Crose's use of MDMA caused his stroke, triggering both portions of the exclusion.

As set forth below, the Court finds MDMA is a "narcotic" within the meaning of the Policy. Further, the Court finds Humana has shown Mr. Crose's stroke was "due to" his ingestion of MDMA, and Plaintiff has failed to adduce evidence sufficient to create a genuine issue of fact concerning that causal connection. Accordingly, the exclusion applies, and Humana is entitled to summary judgment. The Court declines to consider the parties' arguments concerning intoxication.

## A.    Whether MDMA is a "Narcotic"

Giving the word "narcotic" its plain and ordinary meaning, the Court finds MDMA is a "narcotic" within the meaning of the Policy.

As this is a diversity case, Texas rules of contract interpretation control. *Am. Nat. Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir. 2001). Under Texas law, the same rules apply to the interpretation of insurance contracts as apply to the interpretation of other contracts. *Id.* (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994)). Terms used in an insurance policy are given their plain and ordinary meaning unless the policy shows the parties intended the terms have a different meaning. *Id.* (citing *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984)). Ambiguous insurance contracts will be construed against the insurer. *Id.* (citing *Tex. Dep't of Hous. & Cmty. Affairs v. Verex Assurance, Inc.*, 68 F.3d 922, 929 (5th Cir. 1995); *Nat'l Union Firs Ins. Co. v. Hudson Ener. Co.*, 811 S.W.2d 552, 555 (Tex. 1991)). "'The policy of strict construction against the insurer is especially strong when the court is dealing with exceptions and words of limitation.'" *Id.* (quoting *Blaylock v. Am. Guar. Bank Liab. Ins. Co.*, 632 S.W.2d 719, 721 (Tex. 1982)). "Where an ambiguity involves an exclusionary provision of an insurance policy,

-6-

[courts] 'must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable[.]'" *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998) (quoting *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991)). Where no ambiguity exists, however, these interpretive rules do not apply. *State Farm Lloyds v. Marchetti*, 962 S.W.2d 58, 60 (Tex. App.—Houston [1st Dist.] 1997, pet. denied). The mere fact the parties proffer conflicting interpretations of a term does not render the term ambiguous. *ACE Am. Ins. Co. v. Freeport Welding & Fabricating*, 699 F.3d 832, 842 (5th Cir. 2010).

Again, the Policy excludes coverage for any "loss due to being . . . under the influence of any narcotic." Policy at 47. The term "narcotic" is not defined in the Policy. Plaintiff contends "narcotic" may be understood either to include (1) all drugs or (2) only opium, opiates, cocaine, and related substances, and that the term is therefore ambiguous, requiring construal in favor of Mr. Crose. Humana responds the term "narcotic" unambiguously includes all drugs and Plaintiff's definition is unreasonable.

Plaintiff does have a point. The Texas Controlled Substances Act, for example, limits its definition of "narcotic drug" to opium, opiates, cocaine, and related substances, TEX. HEALTH & SAFETY CODE § 481.002(29), and classifies MDMA as a hallucinogen, not as an opiate or related substance. *See id.* §§ 481.102 (listing specific "opiates," "opium derivatives," and related substances without listing MDMA (3,4—methylenedioxy methamphetamine)), 481.103(a)(1) (listing MDMA as a hallucinogen). The federal statutory scheme is extremely similar: the definition of "narcotic drug" contained in the federal Controlled Substances Act is materially identical to the Texas definition, *see* 21 U.S.C. § 802(17) (defining "narcotic drug" to include opium, opiates, cocaine, and related substances), and the federal Drug Enforcement Administration classifies MDMA as a non-

-7-

Case 1:14-cv-00205-SS   Document 33   Filed 06/01/15   Page 8 of 19

narcotic.[3]  Plaintiff further points to the Oxford English Dictionary (OED), which defines "narcotic" as "[a] drug which when swallowed, inhaled, or injected into the system induces drowsiness, stupor, or insensibility, according to its strength and the amount taken; *esp.* an opiate."[4]  According to Plaintiff, "[t]his definition does not describe ecstasy[,]" as MDMA does not produce "sedative effects" like drowsiness or stupor; thus, in Plaintiff's view, in addition to MDMA's incongruence with the state and federal statutory definitions of "narcotic," it does not fit within the dictionary definition of the term.  Pl.'s Mot. Summ. J. [#21] at 7–8.

The Court, however, is unpersuaded by Plaintiff's argument these differing definitions render the term "narcotic" ambiguous as used in the Policy.  In the opinion of the Court, neither the OED definition nor the definitions found in the state and federal statutes reflect the ordinary meaning of the term "narcotic" as it would be understood by a layperson, as both are specialized definitions intended for use in specific contexts.   The OED definition Plaintiff cites includes a notation—"*Med.*"—indicating it is a specialized medical definition.[5]  Testimony from Plaintiff's own expert suggests the OED definition is a pharmacological one used in medical settings.  *See* App'x Pl.'s Mot. Summ. J. [#22-4] Ex. D (Bertelson Report) at 10 ("In my experience *in the medical setting*, the word 'narcotic' is almost exclusively used when discussing certain pain medications." (emphasis added)).  The federal and state statutory definitions are part of highly detailed schemes that distinguish between different substances—using, for example, the words "drug," "narcotic,"

---

[3] *See Controlled Substances by CSA Schedule* at 1, http://www.deadiversion.usdoj.gov/schedules/orangebook/e_cs_sched.pdf.

[4] *Narcotic, n.*, OED ONLINE, Dec. 2014, http://www.oed.com/view/Entry/125101?result=1&rskey=BoFmF0&.

[5] *See supra* n.5 (emphasis in original); *How to use the OED: Abbreviations*, http://public.oed.com/how-to-use-the-oed/abbreviations/#m (indicating "*Med.*" stands for "medicine, medical").

"chemical," "controlled substance analogue," "controlled substance," "depressant substance," "stimulant substance," and others in differing contexts—in regulating producers, distributors, dispensers, persons in possession of, and users of different types of substances. *See* 21 U.S.C. § 802 (defining terms); TEX. HEALTH & SAFETY CODE § 481.002 (same).  Further, these definitions are themselves incongruent.  Cocaine, for example, does not induce drowsiness or stupor, and thus does not fall within the OED definition, yet is nevertheless classified as a narcotic under Texas and federal law.  *See* U.S. DEP'T OF JUSTICE, DRUG ENFORCEMENT ADMIN., DRUGS OF ABUSE 45 (2011) ("Cocaine is an intense, euphoria-producing stimulant drug . . . .  Other effects include increased alertness and excitation[.]").[6]

The Court concludes these specialized definitions offered by Plaintiff are not appropriately applied to the Policy.  Rather, because nothing in the Policy shows "narcotic" was meant in a technical or specialized sense, it must be "given [its] ordinary and *generally-accepted* meaning[.]" *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010) (emphasis added); *see Travelers' Indem. Co. v. DeWitt*, 207 S.W.2d 641, 643 (Tex. 1948) ("[C]ontracts of insurance, like other contracts, must be construed . . . in their plain, ordinary and *popular* sense." (internal quotation omitted) (emphasis added)).

In determining the ordinary and generally-accepted meaning of "narcotic," the Court can first look back to the same OED entry cited by Plaintiff.  In addition to the specialized medical definition, the OED contains a second, more generic definition: "A drug affecting mood or behaviour which is sold for non-medical purposes, *esp.* one whose use is prohibited or under strict legal control but

---

[6] *Available at* http://www.dea.gov/pr/multimedia-library/publications/drug_of_abuse.pdf#page=45.

which tends nevertheless to be extensively used illegally."[7] This second definition includes the notation "orig. *U.S.*," indicating the definition originated in and is used in the United States. MDMA is a mood-affecting drug, sold in the United States for non-medical purposes, that is prohibited by federal and state law yet extensively used illegally. *See, e.g.*, Def.'s Mot. Summ. J. [#25-12] (sealed) Ex. 12 (Senate Caucus Int'l Narcotics Control, Dr. Jacobs Statement) at 3–5 (describing mood-affecting properties of MDMA and "steadily increasing" recreational MDMA use in the United States). Thus, under the OED's general definition, MDMA is a narcotic, and the Court agrees laypersons understand it as such. *See also* PLITT ET AL., COUCH ON INSURANCE § 144:43 ("Where the exclusion is worded so as to prevent recovery for injuries or sicknesses arising from the use of 'narcotics,' the term narcotics is given its common meaning as 'illegal drug' and therefore includes cocaine."). The Court therefore finds the term "narcotic" is not ambiguous, and that MDMA is a "narcotic" within the meaning of the Policy.

**B.      Whether Mr. Crose's Stroke Was "Due to . . . Being Under the Influence of" MDMA**

Having determined MDMA is a narcotic within the meaning of the Policy, the Court turns to the question whether Mr. Crose's stroke was "due to . . . being under the influence of" MDMA. Policy at 47. Plaintiff does not dispute in her briefing that Mr. Crose was "under the influence of" MDMA when he suffered the stroke; only whether the stroke was "due to" his being under the influence is contested. Two issues must be resolved: first, the precise causal nexus required by the exclusion, and second, whether Humana has shown causation as a matter of law. As set forth below, the Court concludes the exclusion requires a showing of proximate cause, as the term is used in insurance law. Further, the Court finds Humana has made that showing, and Plaintiff has failed to

---

[7] *See supra* n.5.

-10-

adduce evidence creating a fact issue as to causation.  Accordingly, Humana is entitled to summary judgment.

### 1.    The causal nexus required by the exclusion

Plaintiff argues in order to show causation, Humana must "prove, to a reasonable degree of medical certainty, based on a reasonable medical probability and scientifically reliable evidence, that Ron Crose's use of [MDMA] caused the injury." Pl.'s Mot. Summ. J. [#21] at 11.  Humana counters Plaintiff's formulation of the causation standard impermissibility heightens its burden of proof by requiring a showing of sole causation, and claims it need only demonstrate that Mr. Crose's MDMA ingestion was *a* cause, not *the* cause, of his stroke.  To the extent Plaintiff's formulation of the standard suggests Humana must show MDMA ingestion was the sole cause of Mr. Crose's stroke, the Court disagrees with Plaintiff.  Rather, the Court interprets the phrase "due to" to require a showing of proximate cause.

The Texas Supreme Court considered the meaning of the phrase "due to" in an insurance exclusion in *Utica National Insurance Co. of Texas v. American Indemnity Co.*, 141 S.W.3d 198 (Tex. 2004).  In *Utica*, patients of certain doctors became sick after being injected with contaminated anesthetic. *Id.* at 199.  The anesthetic was contaminated because an low-level employee of the medical facility had been using dirty needles to steal the anesthetic and inject himself with it. *Id.* at 200. The defendant argued the patients' injuries fell within a provision excluding coverage for injury "due to" the rendition of professional services. *Id.* at 202.  Finding against the defendant, the Court concluded the exclusion required "more than [a] simple cause in fact" relationship between the patients' illness and the injections their doctors administered. *Id.* at 203. The Court noted the phrase "arising out of," which was used in other exclusions within the same policy, meant simply "but for

causation, though not necessarily direct or proximate causation." *Id.* (citing *Mid-Century Ins. Co. v. Lindsey*, 997 S.W.2d 153, 156 (Tex. 1999)). Finding the different wording significant, the Court concluded "[t]he most reasonable conclusion is that 'due to' requires a more direct type of causation that could tie the insured's liability to the manner in which the services were performed." *Id.*

Requiring the causal relationship between an insured's injury and the excluded condition be "more direct" than but-for causation does not mean, however, that the insurer must show the excluded condition is the sole cause of the injury. Had the drafters of the Policy intended to require a sole-cause standard, they could have indicated they were doing so by including language like "solely results" or "directly results independently of all other causes." *See Edwards v. Emps. Ret. Sys. of Tex.*, No. 03-03-00737-CV, 2004 WL 1898253, at *5 (Tex. App.—Austin Aug. 26, 2004, no pet.) (citing *Stroburg v. Ins. Co. of N. Am.*, 464 S.W.2d 827, 828 (Tex. 1971)) (holding the phrase "directly results," absent the additional phrase "independently of all other causes," means proximate cause, not sole cause). Further, while the Court can find no Texas decisions specifically discussing narcotics exclusions in this context, "Texas cases generally interpret alcohol exclusions to apply even where alcohol is not the sole cause of death." *Likens v. Hartford Life & Accident Ins. Co.*, 688 F.3d 197, 202 (5th Cir. 2012).

But the foregoing analysis gives us only a range of causal relationships possibly denoted by "due to": the precise nexus required falls somewhere between simple but-for causation and sole causation. Because the phrase is ambiguous, the Court interprets it to require proximate causation, giving the beneficial reading to Plaintiff. *See id.* (interpreting ambiguous causal language to require proximate causation where that reading benefitted the insured). While proximate cause is a familiar concept from the law of torts, its meaning in insurance law differs slightly: in insurance cases, the

foreseeability element is not required. *Stroburg*, 464 S.W.2d at 831; 46 TEX. JUR. 3D INS. CONTRACTS & COVERAGE § 968. Consequently, as used in insurance law, a proximate cause is "a substantial factor in bringing about injury or death, and without which the injury or death would not have occurred." *See Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 222–23 (Tex. 2010) (explaining a "producing cause" is conceptually identical to proximate cause less the foreseeability requirement, and defining "producing cause" as quoted). Of course, there can be more than one proximate cause of an injury. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010); *see also Likens*, 688 F.3d at 203 (noting, where insurance exclusion requires proximate cause, that "intoxication may not have been the only cause, but it does not have to be so to satisfy the exclusion.").

### 2.    Humana has carried its burden

Plaintiff next claims she is entitled to summary judgment because Humana has failed to carry its burden to produce evidence showing Mr. Crose's stroke was due to being under the influence of MDMA. According to Plaintiff, Dr. Hinze's statements that he "suspect[s]" the stroke was caused by MDMA ingestion and that MDMA ingestion "could produce a hypertensive state, which would exacerbate if not initiate [Mr. Crose's stroke]" fall short of demonstrating MDMA caused the stroke within reasonable medical probability. Additionally, Plaintiff argues the mere fact the stroke occurred a few hours after Mr. Crose ingested MDMA does not establish causation without corroborating proof of a scientific connection between MDMA exposure and stroke, which Plaintiff contends Humana has not offered and cannot offer because it does not exist.

Citing a number of studies relied upon by its experts and Plaintiff's experts which allegedly link MDMA consumption and stroke, Humana contends it has made the required showing as a matter of law, arguing that taken in concert, the opinions of Mr. Crose's doctors and Humana's

experts that MDMA may have caused the stroke, the scientific link between MDMA and stroke demonstrated by the studies, the absence of an alternative explanation for the stroke, and the temporal proximity of Mr. Crose's MDMA ingestion to his stroke prove being under the influence of MDMA was at least *a* cause of Mr. Crose's stroke.  The Court agrees with Humana.

Several pieces of evidence suggest Mr. Crose's ingestion of MDMA was a substantial factor in bringing about Mr. Crose's stroke, without which the stroke would not have occurred.  First, the direct medical evidence submitted by the parties indicates Mr. Crose's treating physician believed, upon examination of Mr. Crose, that his MDMA ingestion led to uncontrolled hypertension[8] which in turn caused his stroke.  *See* Hinze Report at 2 ("I suspect this [stroke] is due to uncontrolled hypertension likely from his ecstasy ingestion."); *id.* ("[E]cstasy ingestion . . . could produce a hypertensive state, which would exacerbate if not initiate his [stroke].").  Mr. Crose's Seton Hospital "face sheet"[9] gives his diagnosis as "Overdose, Brain Bleed."  Def.'s Mot. Summ. J. [#25-14] (sealed) at 10.

The Court cannot agree with Plaintiff's argument Dr. Hinze's use of the phrases "I suspect" and "could produce" detract from the force of his assessment.  In support of her position, Plaintiff cites an unpublished Fourth Circuit opinion, *Moore v. Unum Provident Corp.*, 116 F. App'x 416 (4th Cir. 2006).  In *Moore*, the insured, while under the influence of methamphetamine, attempted to attack his girlfriend's lover with a gun.  *Id.* at 418.  The lover wrested the gun from the insured and beat the insured with it.  *Id.*  The insured then died from cardiac arrhythmia due to the stress of the

---

[8] "Hypertension" is a medical term for high blood pressure. *High blood pressure*, MEDLINEPLUS, U.S. NAT'L LIB. OF MED., http://www.nlm.nih.gov/medlineplus/ency/article/000468.htm ("Hypertension is another term used to describe high blood pressure.").

[9] A "face sheet," typically the first sheet of a hospital chart, gives basic information about the patient. LAURENCE M. DEUTSCH, MEDICAL RECORDS FOR ATTORNEYS 10–11 (2001).

beating. *Id.*  The insurer denied the insured's surviving spouse's death benefits claim on several grounds, one of which was a provision excluding coverage for "injury caused by or contributed to directly or indirectly by: the Insured being under the influence of a 'controlled substance.'"  *Id.*

The only medical analysis of the relationship between the insured's methamphetamine use and his death in the *Moore* record, provided by one Dr. Sweeney, generally discussed the relationship between the use of stimulants and cardiac arrhythmia and concluded "'chronic cocaine and/or methamphetamine abuse could contribute to a cardiomyopathy'" and the "'known pharmacologic effects of methamphetamine . . . could be expected to acutely exacerbate any pre-existing cardiovascular disease.'"  *Id.* at 420.  The *Moore* court found Dr. Sweeney's opinion was "not relevant because there is no evidence that Moore was a chronic user of such drugs."  *Id.* at 421.  Additionally, the court stated Dr. Sweeney's opinion the level of methamphetamine in the insured's system "could" have contributed to his death was "too indefinite" to support a finding that the insured's death resulted from methamphetamine abuse.  *Id.*

Even were *Moore* precedential authority from this Circuit, which it is not, it is distinguishable from this case.  Unlike in *Moore*, Dr. Hinze's opinion was in no way contingent upon whether or not Mr. Crose was a chronic user of MDMA or other drugs or whether or not Mr. Crose had a pre-existing disease.  Rather, Dr. Hinze made it clear the stroke was likely caused by uncontrolled hypertension which resulted from Mr. Crose's ecstasy ingestion, and the medical literature in the record supports Dr. Hinze's assessment, as will be discussed in a moment.  Dr. Hinze was the doctor who treated Mr. Crose upon his admission to the hospital following the stroke and the individual who actually made Mr. Crose's diagnosis—unlike Dr. Sweeney, who was the insurance company's consulting physician.  *See* Brief for Appellant, *Moore*, 116 F. App'x 416 (Nos. 03-2311(L), 04-

-15-

1044), 2004 WL 5871654, at *9 (stating Dr. Sweeney is the insurer's consultant). Further, unlike in this case, there was an obvious alternative explanation for the *Moore* insured's death recognized by the court—the stress of the beating administered by the lover. The Court finds *Moore* unhelpful to resolution of this lawsuit, and declines to hold Dr. Hinze's opinion is "too indefinite" to support causation.

Second, the connections between (1) MDMA and hypertension and (2) hypertension and stroke are both well documented, and appear in the evidence submitted by both parties. *See, e.g.*, Def.'s Mot. Summ. J. [#25-12] (sealed) Ex. 12 at 4 (U.S. Senate Caucus Report listing "hypertension" as a "common acute medical effect" of MDMA); *id.* [#25-11] (sealed) Ex. 11 pp. 17–24 (Nat'l Institute on Drug Abuse Report) at 4 (noting symptoms of MDMA overdose include hypertension); Bertelson Report at 8 (Plaintiff's expert, noting hypertension is a side effect of MDMA); Def.'s Mot. Summ. J. [#25-5] (sealed) Ex. 5 at 1 (report from clinic & spinal institute stating intracerebral hemorrhage, or stroke, "is most commonly caused by hypertension"); Bertelson Report at 8 (Plaintiff's expert, noting hypertension is "by far the most common attributable risk factor" to stroke); App'x Pl.'s Mot. Summ. J. [#22-6] Ex. F-B at EC001117 (article from medical publication "Stroke" indicating strokes result from "sustained hypertension"). Further, while it is true the direct link between MDMA and stroke is less well documented in the medical literature, several of the articles and studies relied upon by both parties' experts recognize a link does indeed exist. *See* App'x Pl.'s Mot. Summ. J. [#22-4] Ex. D pp. 30–43 (The Pharmacology & Toxicology of MDMA) at 922–23 (explaining one of MDMA's two basic "serious adverse effects on the cardiovascular system" is "hypertension, with a consequent risk of ruptured blood vessels and internal hemorrhage" and noting "[m]ajor intracranial hemorrhages have been reported" in the

clinical literature); *id.* [#22-4] Ex. D pp. 71–78 (Acute Toxic Effects of MDMA) at 680 ("An association between Ecstasy use and cerebral haemorrhage . . . has been reported."); Def.'s Mot. Summ. J. [#25-11] (sealed) Ex. 11 pp. 39–40 (Cerebral Infarction) (reporting a 1993 case of stroke following MDMA ingestion, believed by the authors to be the first recorded in the literature).

Third, the doctors who treated Mr. Crose following his stroke found no evidence which would provide an alternative explanation for the event. Dr. Jefferson Miley, Mr. Crose's neurologist, noted while underlying vascular malformation was typically the cause of stroke in men of Mr. Crose's age, "[t]here was no evidence found of vascular malformation in Ron[.]"[10] App'x Pl.'s Mot. Summ. J. [#22-6] Ex. F (Miley Decl.) at 1. Additionally, Mr. Crose had no history of hypertension prior to this event. Def.'s Mot. Summ. J. [#25-14] (sealed) Ex. 14-A pp. 23–26 (Seton Progress Notes) at 23 ("pt has no underlying hx of HTN."). Plaintiff has adduced no evidence suggesting Mr. Crose's stroke had some other underlying cause; in essence, Plaintiff's argument boils down to an unsupported claim that while Plaintiff does not know what caused Mr. Crose's stroke, it could not have been the ecstasy. While stroke may be a rare consequence of ecstasy ingestion, it is nevertheless a medically recognized potential consequence, and no other explanations for the stroke were offered by Mr. Crose's physicians.

Fourth, while Plaintiff is correct that temporal proximity between Mr. Crose's MDMA ingestion and his stroke is not alone enough to demonstrate causation, the temporal relationship between the two events does suggest the possibility of a causal connection. Combined with the

---

[10] Dr. Miley went on to state that while no evidence of vascular malformation was found, "that does not mean it did not exist" and speculated any such evidence "may not have been preserved during the surgery to remove the hematoma." Miley Decl. at 1. The Court declines to give weight to this unsupported speculation. *See Turner*, 476 F.3d at 343 (unsupported speculation cannot defeat summary judgment).

evidence canvassed above, the fact that Mr. Crose's stroke occurred within hours after he ingested ecstasy has probative value. *See Guevara v. Ferrer*, 247 S.W.3d 662, 668 (Tex. 2007) ("[W]hen combined with other causation evidence, evidence that conditions exhibited themselves or were diagnosed shortly after an event may be probative in determining causation.").

Finally, the expert testimony upon which Plaintiff relies, attempting to create a genuine issue of fact on the causation question, misconstrues the applicable legal standard. Plaintiff's expert, Dr. Bertelson, concludes that given the limited amount of medical literature documenting a connection between MDMA and stroke, "it is not possible to say with reasonable medical probability that MDMA was *the* cause of the hemorrhage in Mr. Crose." Bertelson Report at 9 (emphasis added). Similarly, in his declaration for Plaintiff, Dr. Miley opines "[i]t is fair to say with . . . 100% certainty that ecstasy may have not been *the only absolute cause* of Ron's intracerebral hemorrhage." Miley Decl. at 1 (emphasis added). Both experts' testimony suggests Humana is required to prove ecstasy ingestion was *the* cause of the stroke. Again, it is not. Humana's burden is only to demonstrate ecstasy ingestion was *a* cause of the stroke—a substantial factor without which the stroke would not have occurred. Dr. Bertelson's report and Dr. Miley's declaration thus do not create a genuine issue as to whether MDMA was *a* cause of the stroke. Notably, considered under the proper causal standard, portions of Dr. Miley's declaration tend to support Humana. *See id.* ("Use of ecstasy can increase the odds of suffering an ischemic stroke or intracerebral hemorrhages but the cause-effect is not 100%. Use of this drug is considered to be a risk factor.").

In sum, Humana has adduced evidence demonstrating Mr. Crose's stroke was proximately caused by his MDMA ingestion. Plaintiff has failed to present contrary evidence raising a genuine issue of fact. The Court concludes as Mr. Crose's stroke occurred "due to" his ingestion of MDMA,

Humana properly denied coverage on the basis of the Policy's narcotics exclusion. Plaintiff's Texas Insurance Code claims therefore fail as well. *See Arredondo v. Hartford Life & Acc. Ins. Co.*, 860 F. Supp. 2d 363, 371 (S.D. Tex. 2012) (citing *Provident Am. Ins. Co. v. Casteneda*, 988 S.W.2d 189, 194 (Tex. 1998)) ("[N]o violation of the . . . Insurance Code exists unless an insurer denies a claim when liability is 'reasonably clear.'"). Humana is entitled to summary judgment.

### Conclusion

Accordingly:

IT IS ORDERED that Plaintiff Eleanor Crose's Unopposed Motion for Leave to File Supplemental Summary Judgment Evidence [#27] is GRANTED;

IT IS FURTHER ORDERED that Defendant Humana Insurance Company's Motions for Leave to File Under Seal [##28, 31] are GRANTED;

IT IS FURTHER ORDERED that Plaintiff Eleanor Crose's Motion for Summary Judgment [#21] is DENIED; and

IT IS FINALLY ORDERED that Defendant Humana Insurance Company's Motion for Summary Judgment [#25] (sealed) is GRANTED.

SIGNED this the 28th day of May 2015.

SAM SPARKS
UNITED STATES DISTRICT JUDGE